# EXHIBIT A

Law Division Motion Section Initial Case Management Dates for CIVIL AND JURY cases will be heard in person;
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: <<CmsHearingStart>>

FILED
12/30/2024 6:55 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2024L014871
Calendar, R
2074288

FILED DATE: 12/30/2024 6:55 PM   2024L014871

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| JOHN T. DOE, | ) **TRIAL BY JURY DEMANDED** |
| | ) |
| Plaintiff, | ) |
| | ) No. _____ |
| v. | ) |
| | ) |
| THE CATHOLIC BISHOP OF CHICAGO, a | ) |
| Corporation Sole, and THE ARCHDIOCESE | ) |
| OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT AT LAW

Plaintiff John T. Doe, by and through his attorneys Condon Law Firm; Faccenda Law Group LLC and Coogan & Gallagher, for his Complaint at Law against the Defendants the Catholic Bishop of Chicago, a corporation sole; and the Archdiocese of Chicago, states as follows:

### GENERAL ALLEGATIONS

**Parties & Jurisdiction**

1.      This is an action for damages arising from the sexual abuse and exploitation of the Plaintiff by Daniel McCormack ("McCormack"), who worked for Defendants as a priest during the relevant time period.

2.      The Defendants have received allegations that McCormack sexually abused over 100 children while he worked for them as a priest.

3.      The Plaintiff John T. Doe was born in August 1986.

4.      At all relevant times, Plaintiff was a resident of Cook County, Illinois.

FILED DATE: 12/30/2024 6:55 PM 2024L014871

5.      Defendant the Catholic Bishop of Chicago, a corporation sole, is an Illinois corporation.

6.      As a corporation sole, the Catholic Bishop of Chicago is a corporation created by a special act of the Illinois General Assembly, consisting of a single incorporated office, occupied by a single person.

7.      The Archbishop of Chicago occupies the corporate office of the Catholic Bishop of Chicago, a corporation sole.

8.      The Catholic Bishop of Chicago, a corporation sole, does business in Illinois.

9.      Defendant the Archdiocese of Chicago is a voluntary unincorporated association.

10.      The Archdiocese of Chicago is an organization that does business in Illinois and its principal address is in Chicago, Cook County, Illinois.

**Background on Defendants**

11.      The Catholic Bishop of Chicago operates in both ecclesiastical and civil matters.

12.      At all relevant times, the Catholic Bishop of Chicago acted through its duly authorized officers, administrators, cardinals, archbishops, bishops, priests, vicars, managers, agents, and employees.

13.      The Archdiocese of Chicago operates in both ecclesiastical and civil matters.

14.      At all relevant times, the Archdiocese of Chicago acted through its duly authorized officers, administrators, cardinals, archbishops, bishops, priests, vicars, managers, agents, and employees.

15.      The Archdiocese of Chicago and the Catholic Bishop of Chicago, a corporation sole, have combined and overlapping operations.  (Defendants the Catholic Bishop of Chicago, a

FILED DATE: 12/30/2024 6:55 PM    2024L014871

corporation sole, and the Archdiocese of Chicago are also collectively referred to as the "Archdiocese.")

16.     The Archdiocese of Chicago and the Catholic Bishop of Chicago are two separate but not mutually exclusive entities.

17.     At all relevant times, the professed mission of the Archdiocese of Chicago has included providing religious and secular education, guidance, coaching, and counseling to persons within the Archdiocese, including children and adolescents.

18.     The administrative structure of the Archdiocese of Chicago is a vertical hierarchy with the Archbishop of Chicago at the top.

19.     The Archbishop of Chicago is the highest authority of the Catholic Bishop of Chicago, a corporation sole.

20.     The Archbishop of Chicago is the highest authority of the Archdiocese of Chicago.

21.     The Archbishop of Chicago has the power to appoint priests to positions within the Archdiocese, including appointments as pastors at parishes in the Archdiocese.

22.     The Archbishop of Chicago has the power to remove priests from positions within the Archdiocese, including removal of priests as pastors at parishes in the Archdiocese.

23.     From August 1982 to November 1996, Cardinal Joseph Bernardin ("Cardinal Bernardin"), now deceased, was the highest-ranking authority in the Archdiocese as the Archbishop of Chicago, and was responsible for the administration of the Archdiocese, which included the supervision and retention of priest employees and non-priest employees working for the Archdiocese.

24.     From August 1982 to November 1996, Cardinal Bernardin was the leader and person responsible for day-to-day operations of the Archdiocese.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

25.     From August 1982 to November 1996, Cardinal Bernardin was an employee of the Archdiocese and acting within the scope of his authority.

26.     From May 1997 to September 2014, Cardinal Francis George ("Cardinal George"), now deceased, was the highest-ranking authority in the Archdiocese as the Archbishop of Chicago, and was responsible for the administration of the Archdiocese, which included the supervision and retention of priest employees and non-priest employees working for the Archdiocese.

27.     From May 1997 to September 2014, Cardinal George was the leader and person responsible for day-to-day operations of the Archdiocese.

28.     From May 1997 to September 2014, Cardinal George was an employee of the Archdiocese and acting within the scope of his authority.

29.     McCormack was an agent of the Archbishop of Chicago.

30.     McCormack was an agent of the Archdiocese of Chicago.

31.     McCormack was an agent of the Catholic Bishop of Chicago.

32.     The Archdiocese operates within a geographic area of over 1,000 square miles in Cook and Lake Counties, Illinois.

33.     The Archdiocese of Chicago holds title to its real properties through the Catholic Bishop of Chicago, a corporation sole.

34.     The Archdiocese of Chicago buys, holds, and sells ownership of real and personal property through the Catholic Bishop of Chicago, a corporation sole.

35.     Within its area of operations, the Archdiocese designates certain geographic areas or territories as parishes.

36.     The Archdiocese's parishes are part of the Archdiocese organization.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

37.     At all relevant times, including from 2000 to 2006, the Archdiocese owned, operated, managed, and controlled various properties, facilities and institutions, including parish churches, rectories, and schools.

38.     The Archdiocese of Chicago has various administrative departments that oversee the management and day-to-day operations of the Archdiocese.

39.     The Archdiocese of Chicago manages the day-to-day operations of the Catholic Bishop of Chicago, a corporation sole.

40.     The Catholic Bishop of Chicago oversees the financial accounts of the Archdiocese of Chicago, and its parishes and schools.

41.     The Catholic Bishop of Chicago provides financial, legal, and accounting services to the Archdiocese of Chicago.

42.     The Archdiocese has its own bank, known as the Archdiocesan Bank, which among other things provides savings and loan services to Parishes, operates a seminary system for the education of priests, provides a nutritional lunch and breakfast program for students, publishes a biweekly newspaper, and invests available funds.

43.     The Archdiocese reports to the IRS on Form W-2 that priests working for the Archdiocese are "employees."

44.     The Archdiocese reports the wages it pays to priest "employees" on Form W-2.

45.     Parishes in the Archdiocese pay a portion of their income to the Archdiocese as an annual assessment that helps support the operations of the Archdiocese.

46.     Contributions to the Archdiocese at the parish level are used to pay local church, school, and general parish operating costs, but they also provide funds for the Archdiocesan assessment.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

47.     Contributions to the Archdiocese at the parish level are one of the most significant sources of funds for the Archdiocese.

**St. Agatha's Parish**

48.     At all relevant times, including from 2000 to 2006, the Archdiocese owned, operated, managed, and/or controlled St. Agatha's Parish (also "St. Agatha"), located at or near 3147 W. Douglas Boulevard, in Chicago, Illinois, including its church, rectory, school, and buildings.

49.     At all relevant times, including from 2000 to 2006, the Archdiocese of Chicago owned the buildings and real estate comprising St. Agatha's Parish through Catholic Bishop of Chicago, a corporation sole.

50.     At all relevant times, St. Agatha's Parish has been a part of the Archdiocese.

51.     The Archdiocese reported to the IRS on Form W-2 that it paid McCormack wages as an "employee" of St. Agatha Parish.

52.     During the time Daniel McCormack was the pastor of St. Agatha Parish, St. Agatha Parish annually issued an IRS Form W-2 to McCormack to report to the IRS the payments the parish made to McCormack for services as an "employee."

**St. Agatha Family Empowerment Program**

53.     At all relevant times, including from 2000 to 2006, the Archdiocese operated, managed, and controlled a program called the St. Agatha Family Empowerment program ("SAFE").

54.     At all relevant times, including from 2000 to 2006, the S.A.F.E program was operated on and around the grounds of the St. Agatha church, rectory, and school buildings.

FILED DATE: 12/30/2024 6:55 PM   2024L014871

55.    SAFE shared the same address as St. Agatha Parish – 3147 W. Douglas Blvd., Chicago, Illinois.

56.    The SAFE program at St. Agatha included two programs – a mentor and tutoring program for children that involved services such as helping children do their school homework and also a community service program that allowed children in the juvenile justice system to perform their community service time designated by a court.

57.    The SAFE mentor and tutoring program ran during the school year and also during the summer.

58.    The SAFE program maintained records of the children who were enrolled in the mentoring and tutoring program.

59.    Some SAFE records regarding the attendance of children in the SAFE program during 1999 to 2006 are missing or have been destroyed.

60.    During the years 2000 to 2006, the Archdiocese knowingly allowed children to perform community service with SAFE at St. Agatha.

61.    Children who were not formally enrolled in the SAFE program would attend or hang out at some SAFE functions such as cookouts during the summer.

62.    The SAFE program operated primarily on the St. Agatha grounds but SAFE activities also involved field trips to other locations during the summer.

63.    McCormack regularly visited and interacted with children in the SAFE program on a daily basis.

64.    Upon information and belief, the Archdiocese received funds from the government, including funds from the State of Illinois, to be used for the SAFE program, either directly or through St. Agatha's Parish.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

65.     In 2000, St. Agatha's Parish reported to the IRS on Form 941 that it used the trade name St. Agatha Family Empowerment.

66.     SAFE paid teenagers and adults who worked for the program.

67.     SAFE workers were paid out of the St. Agatha Payroll Account.

**Archdiocese Policies**

68.     The Archdiocese has hundreds of pages of written policies that govern its operations included in five "Books" titled Book I (General Norms, Accountability and Ecclesiastical Processes), Book II (The People of God), Book III (The Teaching Office of the Church), Book IV (The Sanctifying Office of the Church), and Book V (The Temporal Goods of the Church).

69.     The Archdiocese also follows the universal laws of the Catholic Church known as the Code of Canon Law.

70.     The Archdiocese's written policies incorporate by reference the Code of Canon Law.

71.     The Archdiocese's written policies state that the Archdiocese of Chicago shall follow all civil laws unless they contradict the Code of Canon Law.

72.     The corporate bylaws of the Catholic Bishop of Chicago, a corporation sole, are included within the written policies of the Archdiocese.

73.     The Archdiocese of Chicago performs its operations in accordance with the bylaws of the Catholic Bishop of Chicago, a corporation sole.

74.     The Archdiocese requires its employees to follow civil law.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

75.     The Archdiocese of Chicago holds itself out as a charitable organization that can accept tax deductible gifts of property and money through the Catholic Bishop of Chicago, a corporation sole.

76.     The Archdiocese of Chicago solicits charitable contributions to its organization and represents to potential charitable donors that its legal name is the Catholic Bishop of Chicago.

77.     The Archdiocese's policies and the Code of Canon law state that the Archbishop of Chicago has legislative, executive, and judicial authority over the Archdiocese.

**Child Sexual Abuse by Clergy and the 1992 Cardinal's Commission Report**

78.     For years prior to and including 1992, the Archdiocese was aware of credible allegations of the sexual abuse of minors by priests within the Archdiocese.

79.     For years prior to and including 1992, the Archdiocese was aware of the sexual abuse of minors by priests working for and within the Archdiocese.

80.     For years prior to and including 1992, the Archdiocese failed to create or adopt policies, procedures and/or protocols to prevent the sexual abuse of minors by priests within the Archdiocese, including, but not limited to, preventing a priest who was found to have sexually abused a minor from having continued access to minors, and warning parish members and the public of the priest's history of sexual abuse.

81.     For years prior to and including 1992, the Archdiocese failed to properly implement or enforce policies, procedures and/or protocols to prevent the sexual abuse of minors by priests within the Archdiocese.

82.     In June 1992, as a result of a request by Cardinal Bernardin, the Cardinal's Commission on Clerical Sexual Misconduct with Minors ("Cardinal's Commission") submitted a report to Cardinal Bernardin that, among other things, set forth data and facts relating to clerical

FILED DATE: 12/30/2024 6:55 PM    2024L014871

sexual misconduct by priests with minors within the Archdiocese, set forth empirical data regarding sexual abuse disorders, set forth procedures regarding the investigation of child abuse complaints, and set forth specific recommendations designed to prevent child abuse by priests.

83.     One of the specific recommendations of the Cardinal's Commission was that any priest who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would allow him access to minors.

84.     The Cardinal's Commission stated that it identified no conditions in which an exception could be made to its recommendation that any priest who engaged in sexual misconduct with a minor be prohibited from returning to any ministry which would give him access to minors.

85.     From the time that the Archdiocese received the report of the Cardinal's Commission in 1992 to at least 2006, the Archdiocese failed to adopt or properly implement the recommendations of the Cardinal's Commission, including the recommendation that any priest who engaged in sexual misconduct with a minor should not be returned to any ministry which would allow the priest to have access to minors.

86.     Instead of following the recommendations of the Cardinal's Commission, the Archdiocese instituted policies, procedures and/or protocols in 1992 that allowed a priest who had engaged in sexual misconduct with a minor to be returned to work for the Archdiocese in ministry which allowed him to have access to minors.

87.     The policies, procedures, and/or protocols instituted by the Archdiocese in 1992 and thereafter were inadequate in that they provided a path for a priest who had engaged in sexual misconduct with a minor to be returned to ministry which allowed him to have access to minors.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

88.     In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they placed minors at risk of coming in close proximity or contact with priests who had engaged in sexual misconduct with a minor.

89.     In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they placed minors in danger of great harm.

90.     In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they failed to provide an effective system of monitoring priest sexual abusers once they returned to parish activities which allowed such priests to have access to minors.

91.     At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that it was customary within the Archdiocese for its priests to be in the presence of minors without any other adult being present.

92.     At all relevant times, the Archdiocese failed to properly implement and/or enforce its own policies and procedures relating to sexual abuse of minors by priests despite knowing that priests within the Archdiocese had engaged in sexual misconduct with minors.

93.     At all relevant times, the Archdiocese made false representations to the public regarding the safety of minors from sexual abuse by priests within its parishes, including claims that it enforced a "zero tolerance policy" regarding the sexual abuse of minors by priests.

94.     At all relevant times, the Archdiocese's representations to the public regarding the safety of minors from sexual abuse by priests within its parishes were false and misrepresented the manner in which it attempted to prevent sexual misconduct by priests with minors.

FILED DATE: 12/30/2024 6:55 PM   2024L014871

**The Archdiocese received Clear & Repeated Warnings that Father Daniel McCormack was a Danger to Children**

95.     At all relevant times, including from 1986 to 1994, the Archdiocese owned, operated, managed and/or controlled a seminary system, consisting of a college seminary (Niles College of Loyola University) and a graduate seminary school (St. Mary of the Lake, Mundelein), which educated, trained, and promoted men to become priests within the Archdiocese.

96.     At all relevant times, the Archdiocese selected the students who would be admitted, promoted, and/or discharged from the seminaries.

97.     At all relevant times, the Archdiocese trained, supervised, evaluated, assigned, promoted, removed, and/or controlled seminarians and priests within the Archdiocese.

98.     From 1986 to 1990, the Archdiocese admitted, retained, educated, evaluated, trained, and promoted McCormack as a seminarian in its college seminary.

99.     While McCormack was a seminarian, the Archdiocese received information that McCormack had engaged in sexual misconduct with other young seminarians, including fondling the penises of drunk, passed out, or sleeping seminarians.

100.    While McCormack was a seminarian, the Archdiocese also received information that McCormack had engaged in sexual misconduct with a seminarian who was a minor.

101.    Despite repeatedly receiving information about McCormack's sexual misconduct or inappropriate behavior with other young seminarians, including one who was a minor, the Archdiocese retained and promoted McCormack as a seminarian in the Archdiocese's graduate seminary.

102.    During the time McCormack was in its graduate seminary, from 1990 to 1994, the Archdiocese received additional information that McCormack inappropriately touched, patted, pinched, and/or grabbed a minor boy while on a trip to Mexico.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

103. By 1994, as a result of the information the Archdiocese received about McCormack's sexual misconduct while he was a seminarian, the Archdiocese knew, or in the exercise of reasonable care should have known, that McCormack had engaged in inappropriate behavior with minors, had engaged in non-consensual sexual conduct with classmates, and had engaged in non-consensual sexual misconduct with drunk, passed out, and/or sleeping classmates.

104. In 1994 the Archdiocese hired McCormack and gave him the title of priest.

105. From 1994 to 2006, the Archdiocese assigned McCormack to work in various positions, including as a priest at St. Ailbe's Parish, as a teacher and advisor at its college seminary, as a priest at Holy Family Parish, and as a priest at St. Agatha's Parish.

106. During the time McCormack was an Archdiocesan priest between 1994 and 2006, he was under the control and supervision of the Archdiocese.

107. During the time McCormack was an Archdiocesan priest between 1994 and 2006, he was an employee, agent, or apparent agent of the Archdiocese.

108. At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that as a priest McCormack ministered to persons of all ages, including minor children.

109. At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that as a priest McCormack educated and coached minor children within the Archdiocese.

110. At all relevant times, Archdiocesan priests worked with, educated, coached, and ministered to minor children within the Archdiocese.

FILED DATE: 12/30/2024 6:55 PM 2024L014871

111. From 1994 to 2006, the Archdiocese knew, or through the exercise of reasonable care should have known, that the positions to which McCormack was assigned provided him with unrestricted and unsupervised contact with minor children.

112. Between 1994 and 1996, while McCormack was a priest at St. Ailbe's Parish, he had boys in his bedroom, which was a violation of Archdiocese rules and regulations.

113. Between 1994 and 1996, while McCormack was a priest at St. Ailbe's Parish, he had sexual contact with minor children.

114. In October 1999, while McCormack was a priest at Holy Family Parish, he inappropriately told a minor boy to pull his pants down so that McCormack could measure him to be an altar boy.

115. In October 1999, while McCormack was a priest at Holy Family Parish, the Archdiocese, through its Office of Catholic Schools, received repeated reports from a nun that McCormack inappropriately told a minor boy to pull his pants down so that McCormack could measure him to be an altar boy.

116. At all relevant times, Our Lady of The West Side Catholic School operated two campuses: one at St. Agatha and one at Presentation of the Blessed Virgin Mary (BVM) Parish.

117. In approximately September 2000, despite having knowledge of McCormack's prior sexual misconduct and inappropriate behavior, the Archdiocese promoted McCormack to the position of Pastor of St. Agatha's Parish.

118. St. Agatha's Parish included a church, a rectory, and a school campus for Our Lady of The West Side Catholic School.

119. When Presentation BVM Parish closed in 2005, Our Lady of the West Side Catholic School continued to operate the Presentation campus with support from St. Agatha and the Archdiocese.

120. From September 2000 through January 2006, McCormack was the Pastor at St. Agatha, a math teacher at Our Lady of the West Side School, and a boys' basketball coach.

121. As Pastor of St. Agatha's Parish, McCormack's duties included the administration of the parish and parish programs, conducting mass at St. Agatha's Church, administering the Catholic sacraments during church services, providing pastoral care, counseling, spiritual guidance and leadership to parishioners and students, teaching at the school, coaching youth basketball teams, and overseeing the operation of SAFE.

122. As Pastor of St. Agatha's Parish, McCormack had unrestricted and unsupervised access to and contact with young boys and adolescent males, both from within St. Agatha's Parish and from outside the Parish, through his roles as priest, counselor, teacher, coach, mentor, father-figure, and friend.

123. When McCormack was at St. Agatha's Parish, the Archdiocese provided funds and resources to him for the maintenance and operation of St. Agatha's facilities and programs, for the employment of persons in and around the Parish, and for his own personal needs.

124. On information and belief, while McCormack was at St. Agatha's Parish, he used funds provided to him by the Archdiocese to transport, entertain, and employ young boys and adolescent males.

125. When McCormack was at St. Agatha's Parish, the Archdiocese paid him a salary and provided him with a residence, food allowance and insurance, and offered him a retirement pension in addition to other benefits.

FILED DATE: 12/30/2024 6:55 PM 2024L014871

FILED DATE: 12/30/2024 6:55 PM   2024L014871

126.     Between 2000 and 2006, while Pastor of St. Agatha's Parish, McCormack formed, cultivated, and maintained improper and/or sexually abusive relationships with minor boys.

127.     Between 2000 and 2006, while Pastor of St. Agatha's Parish, McCormack had sexual contact with minor boys and male adolescents and maintained sexually abusive relationships with minor boys and male adolescents.

128.     From October 1999 through January 2006, the Archdiocese, through the Office of Catholic Schools, received multiple reports of allegations and/or suspicions regarding McCormack's inappropriate behavior and misconduct with minor students.

129.     Between 2000 and 2006, while McCormack was Pastor at St. Agatha's Parish, the Archdiocese received multiple reports about McCormack having sexual contact with minor boys and male adolescents.

130.     In September 2003, the Archdiocese, through its Office of Vicars for Priests, received notification that McCormack had taken one or more minor boys on an overnight, out-of-state trip and that he allowed boys in and about St. Agatha's private rectory areas, including his private living quarters.

131.     The Archdiocese failed to investigate the 2003 conduct, to report that conduct to governmental or child protection agencies, to report that conduct to St. Agatha's leaders or parishioners, and/or to restrict McCormack's access to minors.

132.     In August 2005, McCormack was arrested, detained, and questioned by the Chicago Police regarding allegations that he sexually touched one or more minor boys.

133.     In August 2005, the Archdiocese had actual knowledge of McCormack's arrest and detention.

134. The Archdiocese retained legal representation for McCormack regarding his arrest and investigation.

135. Despite actual knowledge of McCormack's arrest, the Archdiocese failed to immediately remove McCormack from St. Agatha parish in violation of its Zero Tolerance Policy.

136. Despite actual knowledge of McCormack's arrest, the Archdiocese failed to report his arrest to St. Agatha's leaders or parishioners, or to effectively restrict McCormack's access to minors at St. Agatha.

137. In October 2005, Archdiocese personnel met with the mother or grandmother of the minor boy and they received additional information from her about McCormack's sexual misconduct with her son.

138. In October 2005, the Archdiocese instructed McCormack to undergo tests and/or evaluations to determine, inter alia, his fitness to be a priest and/or the risk he presented to minor children.

139. In October 2005, Archdiocese personnel deemed the allegations of sexual abuse against McCormack sufficient to submit the allegations to the Archdiocese Professional Responsibility Review Board ("Review Board").

140. In October 2005, the Archdiocese's Review Board determined that McCormack should be removed from St. Agatha's Parish for the safety of the children.

141. Between 2000 and 2005, in addition to the arrest, reports and allegations of improper sexual abuse by McCormack, the Archdiocese received other information, reports, and/or allegations of potential improper or sexual conduct by McCormack.

FILED DATE: 12/30/2024 6:55 PM   2024L014871

FILED DATE: 12/30/2024 6:55 PM    2024L014871

142.    Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese allowed McCormack to remain at St. Agatha as Pastor.

143.    Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese continued to allow McCormack to have access to minors.

144.    Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese failed to even place restrictions on McCormack, which would have prevented him from being alone with minors.

145.    Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese failed to prevent the subsequent sexual exploitation of additional minors.

146.    In mid-January 2006, McCormack was again arrested by the Chicago Police for engaging in sexual misconduct with one or more minors.

147.    In January 2006, after McCormack's second arrest, the Archdiocese finally removed McCormack from St. Agatha.

148.    In 2007, at the request of the Archdiocese, the Catholic Church removed (laicized) McCormack from the role of priest.

149.    As of 2021, the Catholic Bishop has received notice of McCormack's improper behavior and/or sexual exploitation of more than 150 minors.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

**The Sexual Abuse and Exploitation of John T. Doe by Father McCormack**

150.    From approximately 2000-2005, Plaintiff interacted with McCormack often, including while he participated in the in the S.A.F.E. program, worked as a mentor in the S.A.F.E. program, played basketball on McCormack's AAU Arsenal team, sang with the St. Agatha's holiday choir, and participated in the African Drum Club.

151.    From approximately 2000-2005, Plaintiff came into regular contact with McCormack.

152.    As a result of Plaintiff's interactions with McCormack, Plaintiff came to trust McCormack as a priest, coach, and father figure.

153.    The Archdiocese created the false impression in the minds of Plaintiff and his mother, that Plaintiff and other children were safe with priests in general and McCormack in particular.

154.    In 2000, McCormack began grooming the Plaintiff for a sexual relationship by taking him on numerous trips, giving Plaintiff money and a phone and allowing Plaintiff to play on the AAU Arsenal team.

155.    In approximately 2000-2001, McCormack began an abusive sexual relationship with Plaintiff while he was a minor.

156.    Between approximately 2000 and 2005, McCormack engaged in sexually abusive conduct toward Plaintiff that included physically hugging Plaintiff, patting and rubbing Plaintiff's buttocks, manual and oral stimulation of Plaintiff's penis, and anal penetration.

157.    At all relevant times, McCormack's actions toward Plaintiff constituted clerical sexual abuse.

FILED DATE: 12/30/2024 6:55 PM    2024L014871

158.     McCormack's sexual abuse of Plaintiff severely injured Plaintiff physically, psychologically, spiritually, and emotionally.

159.     In addition to McCormack's sexual abuse of Plaintiff, McCormack sexually abused other children and adolescents during McCormack's years as an Archdiocesan priest, including during his tenure at St. Agatha's Parish.

160.     In July 2007, McCormack pled guilty to having had sexually abused multiple boys and to having had sexually abusive relationships with multiple boys while an Archdiocesan priest.

161.     After his felony convictions for sexually abusing minors, a court determined that McCormack was a sexually violent person and ordered that McCormack be committed to a State of Illinois facility for sex offenders.

162.     Until recently, McCormack was confined as a sexually violent person.

## COUNT I – NEGLIGENT SUPERVISION
### (Against Archdiocese of Chicago)

163.     Plaintiff repeats and re-alleges the paragraphs of the General Allegations as the first paragraph of this Count.

164.     At all relevant times, the Archdiocese of Chicago had a duty to supervise McCormack as an employee and agent of the Archdiocese of Chicago.

165.     In breach of the aforesaid duty, the Archdiocese of Chicago was guilty of one or more of the following negligent acts and/or omissions:

    a.     Retained McCormack as a priest and employee despite knowledge of his sexually abusive and deviant behavior;

    b.     Failed to transfer or communicate McCormack's history of sexual misconduct within the seminary, orally or through his file, to his subsequent parishes or assignments;

    c.     Allowed McCormack to interact with minors after being advised of allegations of sexual misconduct or abuse;

FILED DATE: 12/30/2024 6:55 PM 2024L014871

d.    Failed to properly investigate reports of inappropriate sexual behavior, inappropriate conduct and/or sexual abuse by priests, including McCormack;

e.    Failed to have an adequate system in place to monitor and/or remove dangerous priests, including McCormack;

f.    Disregarded the recommendation of the Cardinal's Commission that priests who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would give them access to a minor;

g.    Failed to supervise and/or properly supervise McCormack;

h.    Failed to monitor and/or properly monitor McCormack;

i.    Failed to protect minor boys, including Plaintiff, from McCormack's sexual abuse;

j.    Allowed McCormack to have unrestricted and/or unsupervised access to boys and adolescents;

k.    Failed to implement and/or enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

l.    Failed to properly implement and/or properly enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors; and

m.    Failed to remove McCormack immediately after his first arrest in August of 2005.

166.    As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions committed by the Archdiocese of Chicago, Plaintiff suffered severe and ongoing injuries of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1.    Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars ($50,000) for compensatory damages;
2.    Awarding reasonable costs to Plaintiff; and
3.    Providing such other relief as the Court deems just and equitable.

### COUNT II – NEGLIGENT HIRING & RETENTION
### (Against Archdiocese of Chicago)

167.    Plaintiff repeats and re-alleges the paragraphs of the General Allegations as the first paragraph of this Count.

168.    At all relevant times, the Archdiocese of Chicago had a duty to exercise reasonable care in its employment, hiring, and retention of its priests, including McCormack.

FILED DATE: 12/30/2024 6:55 PM          2024L014871

169.    In breach of the aforesaid duty, the Archdiocese of Chicago was guilty of one or more of the following negligent acts and/or omissions:

a.  Hired McCormack as an employee despite knowledge of his sexually abusive and deviant behavior;

b.  Retained McCormack as a priest and employee despite knowledge of his sexually abusive and deviant behavior;

c.  Failed to transfer or communicate McCormack's history of sexual misconduct within the seminary, orally or through his file, to his subsequent parishes or assignments;

d.  Allowed McCormack to interact with minors after being advised of allegations of sexual misconduct or abuse;

e.  Failed to properly investigate reports of inappropriate sexual behavior, inappropriate conduct and/or sexual abuse by priests, including McCormack;

f.  Failed to have an adequate system in place to monitor and/or remove dangerous priests, including McCormack;

g.  Disregarded the recommendation of the Cardinal's Commission that priests who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would give them access to a minor;

h.  Misrepresented to the public the manner in which it addressed sexual abuse by priests, including that it had a "zero tolerance policy" for sexual abuse of minors;

i.  Failed to supervise and/or properly supervise McCormack;

j.  Failed to monitor and/or properly monitor McCormack;

k.  Failed to protect minor boys, including Plaintiff, from McCormack's sexual abuse;

l.  Failed to implement and/or enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

m.  Failed to properly implement and/or properly enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

n.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions of priest sexual misconduct with minor students;

o.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions related to McCormack's sexual misconduct with minor students;

p.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding their reporting responsibilities under the Abused and Neglected Child Reporting Act, 325 ILCS 5/1, *et seq.*; and

q.  Failed to remove McCormack immediately after his first arrest in August of 2005.

FILED DATE: 12/30/2024 6:55 PM   2024L014871

170.     As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions committed by the Archdiocese of Chicago, Plaintiff suffered severe and ongoing injuries of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1.  Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars ($50,000) for compensatory damages;
2.  Awarding reasonable costs to Plaintiff; and
3.  Providing such other relief as the Court deems just and equitable.

## COUNT III – NEGLIGENCE
### (Against Both Defendants)

171.     Plaintiff repeats and re-alleges the paragraphs of the General Allegations as the first paragraph of this Count.

172.     At all relevant times, the Archdiocese had a duty to exercise reasonable care in its operation, management, and control of its parishes and schools, including St. Agatha's Parish and Our Lady of the West Side School.

173.     At all relevant times, the Archdiocese of Chicago had a duty to exercise reasonable care in its employment, appointment, supervision, retention, empowerment, and endorsement of its priests, including McCormack.

174.     At all relevant times, the Archdiocese had a duty to exercise reasonable care to protect minor children who it knew or should have known would come into contact with McCormack.

175.     In breach of the aforesaid duties, the Archdiocese of Chicago was guilty of one or more of the following negligent acts and/or omissions:

a.     Held McCormack out to everyone as a fit and competent agent of the Archdiocese and a minister of Christ;

FILED DATE: 12/30/2024 6:55 PM     2024L014871

b.    Hired McCormack as an employee despite knowledge of his sexually abusive and deviant behavior;

c.    Retained McCormack as a priest and employee despite knowledge of his sexually abusive and deviant behavior;

d.    Failed to transfer or communicate McCormack's history of sexual misconduct within the seminary, orally or through his file, to his subsequent parishes or assignments;

e.    Allowed McCormack to interact with minors after being advised of allegations of sexual misconduct or abuse;

f.    Failed to properly investigate reports of inappropriate sexual behavior, inappropriate conduct and/or sexual abuse by priests, including McCormack;

g.    Failed to have an adequate system in place to monitor and/or remove dangerous priests, including McCormack;

h.    Disregarded the recommendation of the Cardinal's Commission that priests who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would give them access to a minor;

i.    Misrepresented to the public the manner in which it addressed sexual abuse by priests, including that it had a "zero tolerance policy" for sexual abuse of minors;

j.    Failed to supervise and/or properly supervise McCormack;

k.    Failed to monitor and/or properly monitor McCormack;

l.    Failed to protect minor boys, including Plaintiff, from McCormack's sexual abuse;

m.    Allowed McCormack to have unrestricted and/or unsupervised access to boys and adolescents;

n.    Failed to warn the St. Agatha and Our Lady of the West Side School communities, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

o.    Failed to warn the public, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

p.    Failed to implement and/or enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

q.    Failed to properly implement and/or properly enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

r.    Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions of priest sexual misconduct with minor students;

FILED DATE: 12/30/2024 6:55 PM     2024L014871

s.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions related to McCormack's sexual misconduct with minor students;

t.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding their reporting responsibilities under the Abused and Neglected Child Reporting Act, 325 ILCS 5/1, *et seq.*;

u.  Failed to report McCormack to law enforcement or other civil authorities when it knew or should have known of his sexual misconduct and/or abuse against children and adolescents; and

v.  Failed to remove McCormack immediately after his first arrest in August of 2005.

176.  As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions committed by the Archdiocese, Plaintiff suffered severe and ongoing injuries of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1.  Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars ($50,000) for compensatory damages;
2.  Awarding reasonable costs to Plaintiff; and
3.  Providing such other relief as the Court deems just and equitable.

### COUNT IV – WILLFUL & WANTON
### (Against Both Defendants)

177.  Plaintiff repeats and re-alleges the paragraphs of the General Allegations as the first paragraph of this Count.

178.  At all relevant times, the Archdiocese was guilty of conduct showing an utter indifference to or conscious disregard for the safety of others, including minors and the Plaintiff.

179.  At all relevant times, the Archdiocese was guilty of one or more of the following willful and wanton acts and/or omissions:

a.  Held McCormack out to everyone as a fit and competent agent of the Archdiocese and a minister of Christ;

b.  Hired McCormack as an employee despite knowledge of his sexually abusive and deviant behavior;

FILED DATE: 12/30/2024 6:55 PM    2024L014871

c.  Retained McCormack as a priest and employee despite knowledge of his sexually abusive and deviant behavior;

d.  Failed to transfer or communicate McCormack's history of sexual misconduct within the seminary, orally or through his file, to his subsequent parishes or assignment;

e.  Allowed McCormack to interact with minors after being advised of allegations of sexual misconduct or abuse;

f.  Failed to properly investigate reports of inappropriate sexual behavior, inappropriate conduct and/or sexual abuse by priests, including McCormack;

g.  Failed to have an adequate system in place to monitor and/or remove dangerous priests, including McCormack;

h.  Disregarded the recommendation of the Cardinal's Commission that priests who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would give them access to a minor;

i.  Misrepresented to the public the manner in which it addressed sexual abuse by priests, including that it had a "zero tolerance policy" for sexual abuse of minors;

j.  Failed to supervise and/or properly supervise McCormack;

k.  Failed to monitor and/or properly monitor McCormack;

l.  Failed to protect minor boys, including Plaintiff, from McCormack's sexual abuse;

m.  Allowed McCormack to have unrestricted and/or unsupervised access to boys and adolescents;

n.  Failed to warn the St. Agatha and Our Lady of the West Side School communities, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

o.  Failed to warn the public, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

p.  Failed to implement and/or enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

q.  Failed to properly implement and/or properly enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

r.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions of priest sexual misconduct with minor students;

s.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions related to McCormack's sexual misconduct with minor students;

FILED DATE: 12/30/2024 6:55 PM    2024L014871

t.      Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding their reporting responsibilities under the Abused and Neglected Child Reporting Act, 325 ILCS 5/1, *et seq*.;

u.      Failed to report McCormack to law enforcement or other civil authorities when it knew or should have known of his sexual misconduct and/or abuse against children and adolescents; and

v.      Failed to remove McCormack immediately after his first arrest in August of 2005.

180.    As a direct and proximate result of one or more of the aforesaid willful and wanton acts and/or omissions committed by the Archdiocese, Plaintiff suffered severe and ongoing injuries of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1.  Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars ($50,000) for compensatory damages;
2.  Awarding punitive damages to Plaintiff as allowable under Illinois law;
3.  Awarding reasonable costs to Plaintiff; and
4.  Providing such other relief as the Court deems just and equitable.

Respectfully submitted,

*/s/ Gregory T. Condon*
Attorney for Plaintiff John T. Doe

Gregory T. Condon
Condon Law Firm (# 65866)
322 W. Burlington Ave.
La Grange, IL 60525-2363
(708) 579-3888
gcondon@condonlawyers.com

Michael A. Faccenda
Faccenda Law Group LLC (# 61089)
322 W. Burlington Ave.
La Grange, IL 60525-2363
(708) 497-3077
maf@faccendalawgroup.com

FILED DATE: 12/30/2024 6:55 PM    2024L014871

James E. Coogan
Caroleann Gallagher
Coogan Gallagher (# 100030)
444 N. Northwest Hwy., Suite 300
Park Ridge, Illinois 60068
(312) 782-7482
jcoogan@cgtrial.com
cgallagher@cgtrial.com

FILED DATE: 12/30/2024 6:55 PM   2024L014871

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| JOHN T. DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. _____ |
| v. | ) | |
| | ) | |
| THE CATHOLIC BISHOP OF CHICAGO, a | ) | |
| Corporation Sole, and THE ARCHDIOCESE | ) | |
| OF CHICAGO, | ) | |
| | ) | |
| Defendants. | ) | |

**RULE 222 AFFIDAVIT**

The undersigned certifies that the total amount of money damages sought in this

Complaint at Law, exclusive of interest, costs and attorney's fees, exceeds the amount of

$50,000.00.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure,
the undersigned certifies that the statements set forth in this instrument are true and correct,
except as to matters therein stated to be on information and belief and as to such matters the
undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ Gregory T. Condon

Attorney for Plaintiff John T. Doe

FILED
2/28/2022 4:10 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
16884043

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| JOHN U. DOE, | ) | TRIAL BY JURY DEMANDED |
| | ) | |
| Plaintiff, | ) | 2022L001993 |
| | ) | No. _____ |
| v. | ) | |
| | ) | |
| THE CATHOLIC BISHOP OF CHICAGO, a | ) | Hearing Date: 5/4/2022 9:30 AM |
| Corporation Sole, THE ARCHDIOCESE | ) | |
| OF CHICAGO, and DANIEL MCCORMACK, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AT LAW

Plaintiff John U. Doe, by and through his attorneys Condon Law Firm; Kelly & King,

P.C.; and Treat Law Office, P.C.; for his Complaint at Law against the Defendants The Catholic

Bishop of Chicago, a corporation sole; the Archdiocese of Chicago, and Daniel McCormack,

states as follows:

## GENERAL ALLEGATIONS

**Parties & Jurisdiction**

1. This is an action for damages arising from the sexual abuse and exploitation of the

Plaintiff by Defendant Daniel McCormack ("McCormack"), a Roman Catholic priest of the

Archdiocese of Chicago during the relevant time period.

2. The Plaintiff John U. Doe was born in September 1992.

3. At all relevant times, Plaintiff was a resident of Cook County, Illinois.

4. Defendant The Catholic Bishop of Chicago, a corporation sole, is an Illinois

corporation.

FILED DATE: 2/28/2022 4:10 PM   2022L001993

5.     As a corporation sole, The Catholic Bishop of Chicago is a corporation created by a special act of the Illinois General Assembly, consisting of a single ("sole") incorporated office, occupied by a single ("sole") person.

6.     Defendant The Archdiocese of Chicago is an ecclesiastical entity of the Roman Catholic Church serving Roman Catholics in Cook and Lake Counties in Illinois.  (Defendants The Catholic Bishop of Chicago and the Archdiocese of Chicago are collectively referred to as the "Archdiocese of Chicago" or "Archdiocese.")

7.     Defendant McCormack was ordained a Roman Catholic priest in 1994 and was an Archdiocesan priest from 1994 until 2006.

8.     During the time McCormack was an Archdiocesan priest between 1994 and 2006, he was under the control and supervision of the Archdiocese.

9.     During the time McCormack was an Archdiocesan priest between 1994 and 2006, he was an employee, agent, or apparent agent of the Archdiocese.

10.     On information and belief, McCormack currently resides in Chicago, Cook County, Illinois.

11.     At all relevant times, the Archdiocese of Chicago acted through its duly authorized officers, administrators, cardinals, archbishops, bishops, priests, vicars, managers, agents, and employees.

12.     At all relevant times, the Archdiocese of Chicago has been an ecclesiastical entity of the Roman Catholic Church whose professed mission includes providing religious education and training to members of the Roman Catholic faith, administering the sacraments of the Church, and providing religious as well as secular instruction, guidance, coaching, and counseling to persons within the Archdiocese of Chicago, including children and adolescents.

FILED DATE: 2/28/2022 4:10 PM  2022L001993

13.     From August 1982 to November 1996, Cardinal Joseph Bernardin ("Cardinal Bernardin"), now deceased, was the highest-ranking authority in the Archdiocese of Chicago, and was responsible for the administration of the Archdiocese, which included the supervision and retention of the priests and other clergy working in the Archdiocese.

14.     From August 1982 to November 1996, Cardinal Bernardin was the leader and person responsible for day-to-day operations of the Archdiocese of Chicago.

15.     From August 1982 to November 1996, Cardinal Bernardin was an employee of the Archdiocese and acting within the scope of his authority.

16.     From May 1997 to September 2014, Cardinal Francis George ("Cardinal George"), now deceased, was the highest-ranking authority in the Archdiocese of Chicago, and was responsible for the administration of the Archdiocese, which included the supervision and retention of the priests and other clergy working in the Archdiocese.

17.     From May 1997 to September 2014, Cardinal George was the leader and person responsible for day-to-day operations of the Archdiocese of Chicago.

18.     From May 1997 to September 2014, Cardinal George was an employee of the Archdiocese and acting within the scope of his authority.

19.     At all relevant times, including from 2000 to 2006, the Archdiocese owned, operated, managed, and controlled various properties, facilities and institutions, including parish churches, rectories, and schools.

20.     At all relevant times, including from 2000 to 2006, the Archdiocese owned, operated, managed, and/or controlled St. Agatha's Parish (also "St. Agatha"), located at or near 3147 W. Douglas Boulevard, in Chicago, Illinois, including its church, rectory, school, and buildings.

FILED DATE: 2/28/2022 4:10 PM   2022L001993

21.     At all relevant times, St. Agatha's Parish has been a part of the Archdiocese.

22.     At all relevant times, including from 2000 to 2006, the Archdiocese owned, operated, managed, and/or controlled a day care program called the St. Agatha Family Empowerment program ("S.A.F.E.").

**Child Sexual Abuse by Clergy and the 1992 Cardinal's Commission Report**

23.     For years prior to and including 1992, the Archdiocese was aware of credible allegations of the sexual abuse of minors by priests within the Archdiocese of Chicago.

24.     For years prior to and including 1992, the Archdiocese was aware of the sexual abuse of minors by priests within the Archdiocese of Chicago.

25.     For years prior to and including 1992, the Archdiocese failed to create or adopt policies, procedures and/or protocols to prevent the sexual abuse of minors by priests within the Archdiocese of Chicago, including, but not limited to, preventing a priest who was found to have sexually abused a minor from having access to minors, and warning parish members and the public of the priest's history of sexual abuse.

26.     For years prior to and including 1992, the Archdiocese failed to properly implement or enforce policies, procedures and/or protocols to prevent the sexual abuse of minors by priests within the Archdiocese of Chicago.

27.     In June 1992, as a result of a request by Cardinal Bernardin, the Cardinal's Commission on Clerical Sexual Misconduct with Minors ("Cardinal's Commission") submitted a report to Cardinal Bernardin that, among other things, set forth data and facts relating to clerical sexual misconduct by priests with minors within the Archdiocese of Chicago, set forth empirical data regarding sexual abuse disorders, set forth procedures regarding the investigation of child

FILED DATE: 2/28/2022 4:10 PM    2022L001993

abuse complaints, and set forth specific recommendations designed to prevent child abuse by priests.

28.     One of the specific recommendations of the Cardinal's Commission was that any priest who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would allow him access to minors.

29.     The Cardinal's Commission stated that it identified no conditions in which an exception could be made to its recommendation that any priest who engaged in sexual misconduct with a minor be prohibited from returning to any ministry which would give him access to minors.

30.     From the time that the Archdiocese received the report of the Cardinal's Commission in 1992 to at least 2006, the Archdiocese failed to adopt or properly implement the recommendations of the Cardinal's Commission, including the recommendation that any priest who engaged in sexual misconduct with a minor should not be returned to any ministry which would allow the priest to have access to minors.

31.     Instead of following the recommendations of the Cardinal's Commission, the Archdiocese instituted policies, procedures and/or protocols in 1992 that allowed a priest who had engaged in sexual misconduct with a minor to be returned to ministry which allowed him to have access to minors.

32.     The policies, procedures, and/or protocols instituted by the Archdiocese in 1992 and thereafter were inadequate in that they provided a path for a priest who had engaged in sexual misconduct with a minor to be returned to ministry which allowed him to have access to minors.

FILED DATE: 2/28/2022 4:10 PM    2022L001993

33.    In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they placed minors at risk of coming in close proximity or contact with priest sexual abusers.

34.    In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they placed minors in danger of great harm.

35.    In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they failed to provide an effective system of monitoring priest sexual abusers once they returned to parish activities which allowed such priests to have access to minors.

36.    At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that it was customary within the Archdiocese for its priests to be in the presence of minors without any other adult being present.

37.    At all relevant times, the Archdiocese of Chicago failed to properly implement and/or enforce its own policies and procedures relating to sexual abuse of minors by priests despite knowing that priests within the Archdiocese had engaged in sexual misconduct with minors.

38.    At all relevant times, the Archdiocese of Chicago made false representations to the public regarding the safety of minors from sexual abuse by priests within its parishes, including claims that it enforced a "zero tolerance policy" regarding the sexual abuse of minors by priests.

39.    At all relevant times, the Archdiocese of Chicago's representations to the public regarding the safety of minors from sexual abuse by priests within its parishes were false and

misrepresented the manner in which it attempted to prevent sexual misconduct by priests with minors.

**The Archdiocese received Clear & Repeated Warnings that Father Daniel McCormack was a Danger to Children**

40.     At all relevant times, including from 1986 to 1994, the Archdiocese owned, operated, managed and/or controlled a seminary system, consisting of a college seminary (Niles College of Loyola University) and a graduate seminary school (St. Mary of the Lake, Mundelein), which educated, trained, and promoted men to become priests within the Archdiocese.

41.     At all relevant times, the Archdiocese selected the students who would be admitted, promoted, and/or discharged from the seminaries.

42.     At all relevant times, the Archdiocese trained, supervised, evaluated, assigned, promoted, removed, and/or controlled seminarians and priests within the Archdiocese.

43.     From 1986 to 1990, the Archdiocese admitted, retained, educated, evaluated, trained, and promoted McCormack as a seminarian in its college seminary.

44.     While McCormack was a seminarian, the Archdiocese received information that McCormack had engaged in sexual misconduct with other young seminarians, including fondling the penises of drunk, passed out, or sleeping seminarians.

45.     While McCormack was a seminarian, the Archdiocese also received information that McCormack had engaged in sexual misconduct with a seminarian who was a minor.

46.     Despite repeatedly receiving information about McCormack's sexual misconduct or inappropriate behavior with other young seminarians, including one who was a minor, the Archdiocese retained and promoted McCormack as a seminarian in the Archdiocese's graduate seminary.

FILED DATE: 2/28/2022 4:10 PM    2022L001993

FILED DATE: 2/28/2022 4:10 PM    2022L001993

47.     During the time McCormack was in its graduate seminary, from 1990 to 1994, the Archdiocese received additional information that McCormack inappropriately touched, patted, pinched, and/or grabbed a minor boy while on a trip to Mexico.

48.     By 1994, as a result of the information the Archdiocese received about McCormack's sexual misconduct while he was a seminarian, the Archdiocese knew, or in the exercise of reasonable care should have known, that McCormack had engaged in inappropriate behavior with minors, had engaged in non-consensual sexual conduct with classmates, and had engaged in non-consensual sexual misconduct with drunk, passed out, and/or sleeping classmates.

49.     In 1994 the Archdiocese ordained McCormack and promoted him to the position of priest.

50.     From 1994 to 2006, the Archdiocese assigned McCormack to work in various positions, including as a priest at St. Ailbe's Parish, as a teacher and advisor at its college seminary, as a priest at Holy Family Parish, and as a priest at St. Agatha's Parish.

51.     At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that as a priest McCormack ministered to persons of all ages, including minor children.

52.     At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that as a priest McCormack educated and coached minor children within the Archdiocese.

53.     At all relevant times, Archdiocesan priests worked with, educated, coached, and ministered to minor children within the Archdiocese.

FILED DATE: 2/28/2022 4:10 PM    2022L001993

54.     From 1994 to 2006, the Archdiocese knew, or through the exercise of reasonable care should have known, that the positions to which McCormack was assigned provided him with unrestricted and unsupervised contact with minor children.

55.     Between 1994 and 1996, while McCormack was a priest at St. Ailbe's Parish, he had boys in his bedroom, which was a violation of Archdiocese rules and regulations.

56.     Between 1994 and 1996, while McCormack was a priest at St. Ailbe's Parish, he had sexual contact with minor children.

57.     In October 1999, while McCormack was a priest at Holy Family Parish, he inappropriately told a minor boy to pull his pants down so that McCormack could measure him to be an altar boy.

58.     In October 1999, while McCormack was a priest at Holy Family Parish, the Archdiocese, through its Office of Catholic Schools, received repeated reports from a nun that McCormack inappropriately told a minor boy to pull his pants down so that McCormack could measure him to be an altar boy.

59.     At all relevant times, Our Lady of The West Side Catholic School operated two campuses: one at St. Agatha and one at Presentation of the Blessed Virgin Mary (BVM) Parish.

60.     In approximately September 2000, despite having knowledge of McCormack's prior sexual misconduct and inappropriate behavior, the Archdiocese promoted McCormack to the position of Pastor of St. Agatha's Parish.

61.     St. Agatha's Parish included a church, a rectory, and a school campus for Our Lady of The West Side Catholic School.

FILED DATE: 2/28/2022 4:10 PM    2022L001993

62. When Presentation BVM Parish closed in 2005, Our Lady of the West Side Catholic School continued to operate the Presentation campus with support from St. Agatha and the Archdiocese.

63. From September 2000 through January 2006, McCormack was the Pastor at St. Agatha, a math teacher at Our Lady of the West Side School, and a boys' basketball coach.

64. As Pastor of St. Agatha's Parish, McCormack's duties included conducting mass at St. Agatha's Church, administering the Catholic sacraments during church services, providing pastoral care, counseling, spiritual guidance and leadership to parishioners and students, teaching at the school, coaching youth basketball teams, and overseeing the operation of the S.A.F.E. program, which was an afterschool daycare program for children both from within St. Agatha's Parish and from outside the Parish.

65. As Pastor of St. Agatha's Parish, McCormack had unrestricted and unsupervised access to and contact with young boys and adolescent males, both from within St. Agatha's Parish and from outside the Parish, through his roles as priest, counselor, teacher, coach, mentor, and/or friend.

66. When McCormack was at St. Agatha's Parish, the Archdiocese provided funds and resources to him for the maintenance and operation of St. Agatha's facilities and programs, for the employment of persons in and around the Parish, and for his own personal needs.

67. On information and belief, while McCormack was at St. Agatha's Parish, he used funds provided to him by the Archdiocese to transport, entertain, and employ young boys and adolescent males.

FILED DATE: 2/28/2022 4:10 PM    2022L001993

68.     When McCormack was at St. Agatha's Parish, the Archdiocese paid him a salary and provided him with a residence, food allowance and insurance, and offered him a retirement pension in addition to other benefits.

69.     Between 2000 and 2006, while Pastor of St. Agatha's Parish, McCormack formed, cultivated, and maintained improper and/or sexually abusive relationships with minor boys.

70.     Between 2000 and 2006, while Pastor of St. Agatha's Parish, McCormack had sexual contact with minor boys and male adolescents and maintained sexually abusive relationships with minor boys and male adolescents.

71.     From October 1999 through January 2006, the Archdiocese, through the Office of Catholic Schools, received multiple reports of allegations and/or suspicions regarding McCormack's inappropriate behavior and misconduct with minor students.

72.     Between 2000 and 2006, while McCormack was Pastor at St. Agatha's Parish, the Archdiocese received multiple reports about McCormack having sexual contact with minor boys and male adolescents.

73.     In September 2003, the Archdiocese, through its Office of Vicars for Priests, received notification that McCormack had taken one or more minor boys on an overnight, out-of-state trip and that he allowed boys in and about St. Agatha's private rectory areas, including his private living quarters.

74.     The Archdiocese failed to investigate the 2003 conduct, to report that conduct to governmental or child protection agencies, to report that conduct to St. Agatha's leaders or parishioners, and/or to restrict McCormack's access to minors.

FILED DATE: 2/28/2022 4:10 PM    2022L001993

75.    In August 2005, McCormack was arrested, detained, and questioned by the Chicago Police regarding allegations that he sexually touched one or more minor boys.

76.    In August 2005, the Archdiocese had actual knowledge of McCormack's arrest and detention.

77.    The Archdiocese retained legal representation for McCormack regarding his arrest and investigation.

78.    Despite actual knowledge of McCormack's arrest, the Archdiocese failed to immediately remove McCormack from St. Agatha parish in violation of its Zero Tolerance Policy.

79.    Despite actual knowledge of McCormack's arrest, the Archdiocese failed to report his arrest to St. Agatha's leaders or parishioners, or to effectively restrict McCormack's access to minors at St. Agatha.

80.    In October 2005, Archdiocese personnel met with the mother of the minor boy and they received additional information from her about McCormack's sexual misconduct with her son.

81.    In October 2005, the Archdiocese instructed McCormack to undergo tests and/or evaluations to determine, inter alia, his fitness to be a priest and/or the risk he presented to minor children.

82.    In October 2005, Archdiocese personnel deemed the allegations of sexual abuse against McCormack sufficient to submit the allegations to the Archdiocese Professional Responsibility Review Board ("Review Board").

83.    In October 2005, the Archdiocese's Review Board determined that McCormack should be removed from St. Agatha's Parish for the safety of the children.

FILED DATE: 2/28/2022 4:10 PM    2022L001993

84.     Between 2000 and 2005, in addition to the arrest, reports and allegations of improper sexual abuse by McCormack, the Archdiocese received other information, reports, and/or allegations of potential improper or sexual conduct by McCormack.

85.     Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese allowed McCormack to remain at St. Agatha as Pastor.

86.     Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese continued to allow McCormack to have access to minors.

87.     Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese failed to even place restrictions on McCormack, which would have prevented him from being alone with minors.

88.     Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese failed to prevent the subsequent sexual exploitation of additional minors.

89.     In mid-January 2006, McCormack was again arrested by the Chicago Police for engaging in sexual misconduct with one or more minors.

90.     In January 2006, after McCormack's second arrest, the Archdiocese finally removed McCormack from St. Agatha.

FILED DATE: 2/28/2022 4:10 PM   2022L001993

91.     In 2007, at the request of the Archdiocese, the Catholic Church removed (laicized) McCormack from the role of priest.

92.     As of 2021, the Catholic Bishop has received notice of McCormack's improper behavior and/or sexual exploitation of more than 150 minors.

**The Sexual Abuse and Exploitation of John U. Doe by Father McCormack**

93.     Between 1999-2005, Plaintiff attended summer and after-school sessions of S.A.F.E.

94.     Between 2003-2005, Plaintiff played basketball with a team that McCormack coached, although Plaintiff was not a formal member of the team.

95.     Between 2000-2005, Plaintiff regularly interacted with McCormack at S.A.F.E., at mass at St. Agatha's, basketball practices, and neighborhood events.

96.     As a result of Plaintiff's interaction with McCormack, Plaintiff came to trust McCormack as a priest, religious instructor, coach, and father figure.

97.     The Archdiocese created the false impression in the minds of Plaintiff, his parents and/or adult caregivers, that Plaintiff and other children were safe with priests in general and McCormack in particular.

98.     Between 2003-2005, McCormack groomed Plaintiff for a sexual relationship while he was a minor.

99.     Between 2003-2005, McCormack engaged in an abusive sexual relationship with Plaintiff while he was a minor.

100.    Between 2003-2005, McCormack's abuse of Plaintiff included touching and rubbing Plaintiff's body, fondling and manually stimulating Plaintiff's penis, forcing Plaintiff to

FILED DATE: 2/28/2022 4:10 PM 2022L001993

manually stimulate McCormack's penis, forcing Plaintiff to perform fellatio on McCormack, and at least one instance when McCormack penetrated Plaintiff's anus with his finger.

101.    At all relevant times, McCormack's actions toward Plaintiff constituted sexual exploitation.

102.    McCormack's sexual abuse of Plaintiff severely and permanently injured Plaintiff physically, psychologically, spiritually, and emotionally.

103.    In addition to McCormack's sexual abuse of Plaintiff, McCormack sexually abused other children and adolescents during McCormack's years as an Archdiocesan priest, including during his tenure at St. Agatha's Parish.

104.    In July 2007, McCormack pled guilty to sexually abusing and to having sexually abusive relationships with multiple boys while an Archdiocesan priest.

105.    After his felony convictions for sexually abusing minors, a court determined that McCormack was a sexually violent person and ordered that McCormack be committed to a State of Illinois facility for sex offenders.

106.    Until recently, McCormack was confined as a sexually violent person.

107.    At all relevant times, the Archdiocese had a duty to exercise reasonable care in its operation, management, and control of its parishes and schools, including St. Agatha's Parish and Our Lady of the West Side School.

108.    At all relevant times, the Archdiocese had a duty to exercise reasonable care in its employment, appointment, supervision, retention, empowerment, and endorsement of its priests, including McCormack.

FILED DATE: 2/28/2022 4:10 PM     2022L001993

109. At all relevant times, the Archdiocese had a duty to exercise reasonable care to protect minor children who it knew or should have known would come into contact with McCormack.

## COUNT I – NEGLIGENCE
### (VS. CATHOLIC BISHOP OF CHICAGO & ARCHDIOCESE)

110. Plaintiff repeats and re-alleges Paragraphs 1 through 109 of the General Allegations as Paragraph 110 of this Count I.

111. In breach of the aforesaid duties, the Archdiocese of Chicago was guilty of one or more of the following negligent acts and/or omissions:

a. Held McCormack out to everyone as a fit and competent agent of the Archdiocese and a minister of Christ;

b. Retained McCormack as a priest despite knowledge of his sexually abusive and deviant behavior;

c. Failed to transfer or communicate McCormack's history of sexual misconduct within the seminary, orally or through his file, to his subsequent parishes or assignments;

d. Allowed McCormack to interact with minors after being advised of allegations of sexual misconduct or abuse;

e. Failed to properly investigate reports of inappropriate sexual behavior, inappropriate conduct and/or sexual abuse by priests, including McCormack;

f. Failed to have an adequate system in place to monitor and/or remove dangerous priests, including McCormack;

g. Disregarded the recommendation of the Cardinal's Commission that priests who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would give them access to a minor;

h. Misrepresented to the public the manner in which it addressed sexual abuse by priests, including that it had a "zero tolerance policy" for sexual abuse of minors;

i. Failed to supervise and/or properly supervise McCormack;

j. Failed to monitor and/or properly monitor McCormack;

k. Failed to protect minor boys, including Plaintiff, from McCormack's sexual abuse;

l. Allowed McCormack to have unrestricted and/or unsupervised access to boys and adolescents;

FILED DATE: 2/28/2022 4:10 PM        2022L001993

m.  Failed to warn the St. Agatha and Our Lady of the West Side School communities, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

n.  Failed to warn the public, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

o.  Failed to implement and/or enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

p.  Failed to properly implement and/or properly enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

q.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions of priest sexual misconduct with minor students;

r.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions related to McCormack's sexual misconduct with minor students;

s.  Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding their reporting responsibilities under the Abused and Neglected Child Reporting Act, 325 ILCS 5/1, *et seq.*;

t.  Failed to report McCormack to law enforcement or other civil authorities when it knew or should have known of his sexual misconduct and/or abuse against children and adolescents; and

u.  Failed to remove McCormack immediately after his first arrest in August of 2005.

112.  As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions committed by the Archdiocese, Plaintiff suffered severe and ongoing injuries of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1.  Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars ($50,000) for compensatory damages;
2.  Awarding reasonable costs to Plaintiff; and
3.  Providing such other relief as the Court deems just and equitable.

FILED DATE: 2/28/2022 4:10 PM    2022L001993

## COUNT II – WILLFUL & WANTON
## (VS. CATHOLIC BISHOP OF CHICAGO & ARCHDIOCESE)

113.     Plaintiff repeats and re-alleges Paragraphs 1 through 109 of the General

Allegations as Paragraph 113 of this Count II.

114.     At all relevant times, the Archdiocese of Chicago was guilty of conduct showing

an utter indifference to or conscious disregard for the safety of others, including minors and the

Plaintiff.

115.     At all relevant times, the Archdiocese of Chicago was guilty of one or more of the

following willful and wanton acts and/or omissions:

a.     Held McCormack out to everyone as a fit and competent agent of the Archdiocese
and a minister of Christ;

b.     Retained McCormack as a priest despite knowledge of his sexually abusive and
deviant behavior;

c.     Failed to transfer or communicate McCormack's history of sexual misconduct
within the seminary, orally or through his file, to his subsequent parishes or
assignment;

d.     Allowed McCormack to interact with minors after being advised of allegations of
sexual misconduct or abuse;

e.     Failed to properly investigate reports of inappropriate sexual behavior,
inappropriate conduct and/or sexual abuse by priests, including McCormack;

f.     Failed to have an adequate system in place to monitor and/or remove dangerous
priests, including McCormack;

g.     Disregarded the recommendation of the Cardinal's Commission that priests who
engaged in sexual misconduct with a minor should not be returned to parish
ministry or any ministry which would give them access to a minor;

h.     Misrepresented to the public the manner in which it addressed sexual abuse by
priests, including that it had a "zero tolerance policy" for sexual abuse of minors;

i.     Failed to supervise and/or properly supervise McCormack;

j.     Failed to monitor and/or properly monitor McCormack;

k.     Failed to protect minor boys, including Plaintiff, from McCormack's sexual
abuse;

l.     Allowed McCormack to have unrestricted and/or unsupervised access to boys and
adolescents;

FILED DATE: 2/28/2022 4:10 PM    2022L001993

m.    Failed to warn the St. Agatha and Our Lady of the West Side School communities, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

n.    Failed to warn the public, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

o.    Failed to implement and/or enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

p.    Failed to properly implement and/or properly enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

q.    Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions of priest sexual misconduct with minor students;

r.    Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions related to McCormack's sexual misconduct with minor students;

s.    Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding their reporting responsibilities under the Abused and Neglected Child Reporting Act, 325 ILCS 5/1, *et seq.*;

t.    Failed to report McCormack to law enforcement or other civil authorities when it knew or should have known of his sexual misconduct and/or abuse against children and adolescents; and

u.    Failed to remove McCormack immediately after his first arrest in August of 2005.

116.    As a direct and proximate result of one or more of the aforesaid willful and wanton acts and/or omissions committed by the Archdiocese, Plaintiff suffered severe and ongoing injuries of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1. Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars ($50,000) for compensatory damages;
2. Awarding punitive damages to Plaintiff as allowable under Illinois law;
3. Awarding reasonable costs to Plaintiff; and
4. Providing such other relief as the Court deems just and equitable.

FILED DATE: 2/28/2022 4:10 PM   2022L001993

## COUNT III – BATTERY – SEXUAL ABUSE OF A MINOR
## (VS. MCCORMACK)

117.    Plaintiff incorporates Paragraphs 1 through 109 of the General Allegations as

Paragraph 117 of this Count III.

118.    McCormack engaged in the intentional, nonconsensual, harmful, and offensive

touching and sexual abuse of Plaintiff on multiple occasions from 2003-2005 when Plaintiff was

a minor child.

119.    As a direct and proximate result of McCormack's battery and childhood sexual

abuse of Plaintiff, Plaintiff suffered damages of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1.  Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars
    ($50,000) for compensatory damages;
2.  Awarding punitive damages to Plaintiff as allowable under Illinois law;
3.  Awarding reasonable costs to Plaintiff; and
4.  Providing such other relief as the Court deems just and equitable.

Gregory T. Condon                                       Respectfully submitted,
Julia Martin
Condon Law Firm (# 65866)                               /s/ Gregory T. Condon
901 W. Hillgrove Avenue                                 _____
La Grange, Illinois 60525
(708) 579-3888                                          Attorney for Plaintiff
gcondon@condonlawyers.com
jmartin@condondonlawyers.com


David L. King
Paul E. Kelly
Kelly & King, P.C. (# 42409)
19 S. LaSalle, Suite 1000
Chicago, Illinois 60603
(312) 553-5290
pek@kellykinglaw.com
dlk@kellykinglaw.com

FILED DATE: 2/28/2022 4:10 PM   2022L001993

Jonathon Treat (#40898)
Treat Law Office, P.C.
19 S. LaSalle Street, Suite 1000
Chicago, Illinois 60603
(708) 217-4192
treatlaw@gmail.com

FILED
2/28/2022 4:10 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL

FILED DATE: 2/28/2022 4:10 PM  2022L001993

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| JOHN U. DOE, | ) | TRIAL BY JURY DEMANDED |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 2022L001993 |
| v. | ) | |
| | ) | |
| THE CATHOLIC BISHOP OF CHICAGO, a | ) | |
| Corporation Sole, THE ARCHDIOCESE | ) | |
| OF CHICAGO, and DANIEL MCCORMACK, | ) | |
| | ) | |
| Defendants. | ) | |

### RULE 222 AFFIDAVIT

The undersigned certifies that the total amount of money damages sought in this

Complaint at Law, exclusive of interest, costs and attorney's fees, exceeds the amount of

$50,000.00.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ Gregory T. Condon

Attorney for Plaintiff

Law Division Motion Section Initial Case Management Dates for Calendars A, B, C, D, F, H, R, X, Z will be heard in Person.
All other Law Division Initial Case Management Dates will be heard via Zoom
For more information and Zoom Meeting IDs go to https://www.cookcountycourt.org/HOME?Zoom-Links?Agg4906_SelectTab/12
Court Date: <<CmsHearingStart>>

FILED DATE: 12/30/2024 7:15 PM  2024L014875

FILED
12/30/2024 7:15 PM
Mariyana T. Spyropoulos
CIRCUIT CLERK
COOK COUNTY, IL
2024L014875
Calendar, Z
0074351

# IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| JOHN U. DOE, | ) **TRIAL BY JURY DEMANDED** |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. _____ |
| | ) 2024L014875 |
| THE CATHOLIC BISHOP OF CHICAGO, a | ) |
| Corporation Sole, and THE ARCHDIOCESE | ) |
| OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

For updated information about your case, including hearings, subsequent filings and other case information, please visit our Online Case Search and search for your case: https://casesearch.cookcountyclerkofcourt.org

## COMPLAINT AT LAW

Plaintiff John U. Doe, by and through his attorneys Condon Law Firm; Faccenda Law Group LLC and Coogan & Gallagher, for his Complaint at Law against the Defendants Catholic Bishop of Chicago, a corporation sole; and the Archdiocese of Chicago, states as follows:

### GENERAL ALLEGATIONS

**Parties & Jurisdiction**

1. This is an action for damages arising from the sexual abuse and exploitation of the Plaintiff by Daniel McCormack ("McCormack"), who worked for Defendants as a priest during the relevant time period.

2. The Defendants have received allegations that McCormack sexually abused over 100 children while he worked for them as a priest.

3. The Plaintiff John U. Doe was born in September 1992.

4. At all relevant times, Plaintiff was a resident of Cook County, Illinois.

5. Defendant the Catholic Bishop of Chicago, a corporation sole, is an Illinois corporation.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

6.      As a corporation sole, the Catholic Bishop of Chicago is a corporation created by a special act of the Illinois General Assembly, consisting of a single incorporated office, occupied by a single person.

7.      The Archbishop of Chicago occupies the corporate office of the Catholic Bishop of Chicago, a corporation sole.

8.      The Catholic Bishop of Chicago, a corporation sole, does business in Illinois.

9.      Defendant the Archdiocese of Chicago is a voluntary unincorporated association.

10.     The Archdiocese of Chicago is an organization that does business in Illinois and its principal address is in Chicago, Cook County, Illinois.

**Background on Defendants**

11.     The Catholic Bishop of Chicago operates in both ecclesiastical and civil matters.

12.     At all relevant times, the Catholic Bishop of Chicago acted through its duly authorized officers, administrators, cardinals, archbishops, bishops, priests, vicars, managers, agents, and employees.

13.     The Archdiocese of Chicago operates in both ecclesiastical and civil matters.

14.     At all relevant times, the Archdiocese of Chicago acted through its duly authorized officers, administrators, cardinals, archbishops, bishops, priests, vicars, managers, agents, and employees.

15.     The Archdiocese of Chicago and the Catholic Bishop of Chicago, a corporation sole, have combined and overlapping operations.  (Defendants the Catholic Bishop of Chicago, a corporation sole, and the Archdiocese of Chicago are also collectively referred to as the "Archdiocese.")

FILED DATE: 12/30/2024 7:15 PM    2024L014875

16.     The Archdiocese of Chicago and the Catholic Bishop of Chicago are two separate but not mutually exclusive entities.

17.     At all relevant times, the professed mission of the Archdiocese of Chicago has included providing religious and secular education, guidance, coaching, and counseling to persons within the Archdiocese, including children and adolescents.

18.     The administrative structure of the Archdiocese of Chicago is a vertical hierarchy with the Archbishop of Chicago at the top.

19.     The Archbishop of Chicago is the highest authority of the Catholic Bishop of Chicago, a corporation sole.

20.     The Archbishop of Chicago is the highest authority of the Archdiocese of Chicago.

21.     The Archbishop of Chicago has the power to appoint priests to positions within the Archdiocese, including appointments as pastors at parishes in the Archdiocese.

22.     The Archbishop of Chicago has the power to remove priests from positions within the Archdiocese, including removal of priests as pastors at parishes in the Archdiocese.

23.     From August 1982 to November 1996, Cardinal Joseph Bernardin ("Cardinal Bernardin"), now deceased, was the highest-ranking authority in the Archdiocese as the Archbishop of Chicago, and was responsible for the administration of the Archdiocese, which included the supervision and retention of priest employees and non-priest employees working for the Archdiocese.

24.     From August 1982 to November 1996, Cardinal Bernardin was the leader and person responsible for day-to-day operations of the Archdiocese.

25.     From August 1982 to November 1996, Cardinal Bernardin was an employee of the Archdiocese and acting within the scope of his authority.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

26.     From May 1997 to September 2014, Cardinal Francis George ("Cardinal George"), now deceased, was the highest-ranking authority in the Archdiocese as the Archbishop of Chicago, and was responsible for the administration of the Archdiocese, which included the supervision and retention of priest employees and non-priest employees working for the Archdiocese.

27.     From May 1997 to September 2014, Cardinal George was the leader and person responsible for day-to-day operations of the Archdiocese.

28.     From May 1997 to September 2014, Cardinal George was an employee of the Archdiocese and acting within the scope of his authority.

29.     McCormack was an agent of the Archbishop of Chicago.

30.     McCormack was an agent of the Archdiocese of Chicago.

31.     McCormack was an agent of the Catholic Bishop of Chicago.

32.     The Archdiocese operates within a geographic area of over 1,000 square miles in Cook and Lake Counties, Illinois.

33.     The Archdiocese of Chicago holds title to its real properties through the Catholic Bishop of Chicago, a corporation sole.

34.     The Archdiocese of Chicago buys, holds, and sells ownership of real and personal property through the Catholic Bishop of Chicago, a corporation sole.

35.     Within its area of operations, the Archdiocese designates certain geographic areas or territories as parishes.

36.     The Archdiocese's parishes are part of the Archdiocese organization.

37.     At all relevant times, including from 2000 to 2006, the Archdiocese owned, operated, managed, and controlled various properties, facilities and institutions, including parish churches, rectories, and schools.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

38.     The Archdiocese of Chicago has various administrative departments that oversee the management and day-to-day operations of the Archdiocese.

39.     The Archdiocese of Chicago manages the day-to-day operations of the Catholic Bishop of Chicago, a corporation sole.

40.     The Catholic Bishop of Chicago oversees the financial accounts of the Archdiocese of Chicago, and its parishes and schools.

41.     The Catholic Bishop of Chicago provides financial, legal, and accounting services to the Archdiocese of Chicago.

42.     The Archdiocese has its own bank, known as the Archdiocesan Bank, which among other things provides savings and loan services to Parishes, operates a seminary system for the education of priests, provides a nutritional lunch and breakfast program for students, publishes a biweekly newspaper, and invests available funds.

43.     The Archdiocese reports to the IRS on Form W-2 that priests working for the Archdiocese are "employees."

44.     The Archdiocese reports the wages it pays to priest "employees" on Form W-2.

45.     Parishes in the Archdiocese pay a portion of their income to the Archdiocese as an annual assessment that helps support the operations of the Archdiocese.

46.     Contributions to the Archdiocese at the parish level are used to pay local church, school, and general parish operating costs, but they also provide funds for the Archdiocesan assessment.

47.     Contributions to the Archdiocese at the parish level are one of the most significant sources of funds for the Archdiocese.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

**St. Agatha's Parish**

48.    At all relevant times, including from 2000 to 2006, the Archdiocese owned, operated, managed, and/or controlled St. Agatha's Parish (also "St. Agatha"), located at or near 3147 W. Douglas Boulevard, in Chicago, Illinois, including its church, rectory, school, and buildings.

49.    At all relevant times, including from 2000 to 2006, the Archdiocese of Chicago owned the buildings and real estate comprising St. Agatha's Parish through Catholic Bishop of Chicago, a corporation sole.

50.    At all relevant times, St. Agatha's Parish has been a part of the Archdiocese.

51.    The Archdiocese reported to the IRS on Form W-2 that it paid McCormack wages as an "employee" of St. Agatha Parish.

52.    During the time Daniel McCormack was the pastor of St. Agatha Parish, St. Agatha Parish annually issued an IRS Form W-2 to McCormack to report to the IRS the payments the parish made to McCormack for services as an "employee."

**St. Agatha Family Empowerment Program**

53.    At all relevant times, including from 2000 to 2006, the Archdiocese operated, managed, and controlled a program called the St. Agatha Family Empowerment program ("SAFE").

54.    At all relevant times, including from 2000 to 2006, the S.A.F.E program was operated on and around the grounds of the St. Agatha church, rectory, and school buildings.

55.    SAFE shared the same address as St. Agatha Parish – 3147 W. Douglas Blvd., Chicago, Illinois.

FILED DATE: 12/30/2024 7:15 PM 2024L014875

56.     The SAFE program at St. Agatha included two programs – a mentor and tutoring program for children that involved services such as helping children do their school homework and also a community service program that allowed children in the juvenile justice system to perform their community service time designated by a court.

57.     The SAFE mentor and tutoring program ran during the school year and also during the summer.

58.     The SAFE program maintained records of the children who were enrolled in the mentoring and tutoring program.

59.     Some SAFE records regarding the attendance of children in the SAFE program during 1999 to 2006 are missing or have been destroyed.

60.     During the years 2000 to 2006, the Archdiocese knowingly allowed children to perform community service with SAFE at St. Agatha.

61.     Children who were not formally enrolled in the SAFE program would attend or hang out at some SAFE functions such as cookouts during the summer.

62.     The SAFE program operated primarily on the St. Agatha grounds but SAFE activities also involved field trips to other locations during the summer.

63.     McCormack regularly visited and interacted with children in the SAFE program on a daily basis.

64.     Upon information and belief, the Archdiocese received funds from the government, including funds from the State of Illinois, to be used for the SAFE program, either directly or through St. Agatha's Parish.

65.     In 2000, St. Agatha's Parish reported to the IRS on Form 941 that it used the trade name St. Agatha Family Empowerment.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

66.    SAFE paid teenagers and adults who worked for the program.

67.    SAFE workers were paid out of the St. Agatha Payroll Account.

**Archdiocese Policies**

68.    The Archdiocese has hundreds of pages of written policies that govern its operations included in five "Books" titled Book I (General Norms, Accountability and Ecclesiastical Processes), Book II (The People of God), Book III (The Teaching Office of the Church), Book IV (The Sanctifying Office of the Church), and Book V (The Temporal Goods of the Church).

69.    The Archdiocese also follows the universal laws of the Catholic Church known as the Code of Canon Law.

70.    The Archdiocese's written policies incorporate by reference the Code of Canon Law.

71.    The Archdiocese's written policies state that the Archdiocese of Chicago shall follow all civil laws unless they contradict the Code of Canon Law.

72.    The corporate bylaws of the Catholic Bishop of Chicago, a corporation sole, are included within the written policies of the Archdiocese.

73.    The Archdiocese of Chicago performs its operations in accordance with the bylaws of the Catholic Bishop of Chicago, a corporation sole.

74.    The Archdiocese requires its employees to follow civil law.

75.    The Archdiocese of Chicago holds itself out as a charitable organization that can accept tax deductible gifts of property and money through the Catholic Bishop of Chicago, a corporation sole.

8

FILED DATE: 12/30/2024 7:15 PM    2024L014875

76.    The Archdiocese of Chicago solicits charitable contributions to its organization and represents to potential charitable donors that its legal name is the Catholic Bishop of Chicago.

77.    The Archdiocese's policies and the Code of Canon law state that the Archbishop of Chicago has legislative, executive, and judicial authority over the Archdiocese.

**Child Sexual Abuse by Clergy and the 1992 Cardinal's Commission Report**

78.    For years prior to and including 1992, the Archdiocese was aware of credible allegations of the sexual abuse of minors by priests within the Archdiocese.

79.    For years prior to and including 1992, the Archdiocese was aware of the sexual abuse of minors by priests working for and within the Archdiocese.

80.    For years prior to and including 1992, the Archdiocese failed to create or adopt policies, procedures and/or protocols to prevent the sexual abuse of minors by priests within the Archdiocese, including, but not limited to, preventing a priest who was found to have sexually abused a minor from having continued access to minors, and warning parish members and the public of the priest's history of sexual abuse.

81.    For years prior to and including 1992, the Archdiocese failed to properly implement or enforce policies, procedures and/or protocols to prevent the sexual abuse of minors by priests within the Archdiocese.

82.    In June 1992, as a result of a request by Cardinal Bernardin, the Cardinal's Commission on Clerical Sexual Misconduct with Minors ("Cardinal's Commission") submitted a report to Cardinal Bernardin that, among other things, set forth data and facts relating to clerical sexual misconduct by priests with minors within the Archdiocese, set forth empirical data regarding sexual abuse disorders, set forth procedures regarding the investigation of child abuse complaints, and set forth specific recommendations designed to prevent child abuse by priests.

FILED DATE: 12/30/2024 7:15 PM 2024L014875

83.     One of the specific recommendations of the Cardinal's Commission was that any priest who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would allow him access to minors.

84.     The Cardinal's Commission stated that it identified no conditions in which an exception could be made to its recommendation that any priest who engaged in sexual misconduct with a minor be prohibited from returning to any ministry which would give him access to minors.

85.     From the time that the Archdiocese received the report of the Cardinal's Commission in 1992 to at least 2006, the Archdiocese failed to adopt or properly implement the recommendations of the Cardinal's Commission, including the recommendation that any priest who engaged in sexual misconduct with a minor should not be returned to any ministry which would allow the priest to have access to minors.

86.     Instead of following the recommendations of the Cardinal's Commission, the Archdiocese instituted policies, procedures and/or protocols in 1992 that allowed a priest who had engaged in sexual misconduct with a minor to be returned to work for the Archdiocese in ministry which allowed him to have access to minors.

87.     The policies, procedures, and/or protocols instituted by the Archdiocese in 1992 and thereafter were inadequate in that they provided a path for a priest who had engaged in sexual misconduct with a minor to be returned to ministry which allowed him to have access to minors.

88.     In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they placed minors at risk of coming in close proximity or contact with priests who had engaged in sexual misconduct with a minor.

89.     In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they placed minors in danger of great harm.

FILED DATE: 12/30/2024 7:15 PM 2024L014875

90.     In 1992 and thereafter, the policies, procedures, and/or protocols instituted by the Archdiocese were inadequate in that they failed to provide an effective system of monitoring priest sexual abusers once they returned to parish activities which allowed such priests to have access to minors.

91.     At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that it was customary within the Archdiocese for its priests to be in the presence of minors without any other adult being present.

92.     At all relevant times, the Archdiocese failed to properly implement and/or enforce its own policies and procedures relating to sexual abuse of minors by priests despite knowing that priests within the Archdiocese had engaged in sexual misconduct with minors.

93.     At all relevant times, the Archdiocese made false representations to the public regarding the safety of minors from sexual abuse by priests within its parishes, including claims that it enforced a "zero tolerance policy" regarding the sexual abuse of minors by priests.

94.     At all relevant times, the Archdiocese's representations to the public regarding the safety of minors from sexual abuse by priests within its parishes were false and misrepresented the manner in which it attempted to prevent sexual misconduct by priests with minors.

**The Archdiocese received Clear & Repeated Warnings that Father Daniel McCormack was a Danger to Children**

95.     At all relevant times, including from 1986 to 1994, the Archdiocese owned, operated, managed and/or controlled a seminary system, consisting of a college seminary (Niles College of Loyola University) and a graduate seminary school (St. Mary of the Lake, Mundelein), which educated, trained, and promoted men to become priests within the Archdiocese.

96.     At all relevant times, the Archdiocese selected the students who would be admitted, promoted, and/or discharged from the seminaries.

11

FILED DATE: 12/30/2024 7:15 PM  2024L014875

97.     At all relevant times, the Archdiocese trained, supervised, evaluated, assigned, promoted, removed, and/or controlled seminarians and priests within the Archdiocese.

98.     From 1986 to 1990, the Archdiocese admitted, retained, educated, evaluated, trained, and promoted McCormack as a seminarian in its college seminary.

99.     While McCormack was a seminarian, the Archdiocese received information that McCormack had engaged in sexual misconduct with other young seminarians, including fondling the penises of drunk, passed out, or sleeping seminarians.

100.    While McCormack was a seminarian, the Archdiocese also received information that McCormack had engaged in sexual misconduct with a seminarian who was a minor.

101.    Despite repeatedly receiving information about McCormack's sexual misconduct or inappropriate behavior with other young seminarians, including one who was a minor, the Archdiocese retained and promoted McCormack as a seminarian in the Archdiocese's graduate seminary.

102.    During the time McCormack was in its graduate seminary, from 1990 to 1994, the Archdiocese received additional information that McCormack inappropriately touched, patted, pinched, and/or grabbed a minor boy while on a trip to Mexico.

103.    By 1994, as a result of the information the Archdiocese received about McCormack's sexual misconduct while he was a seminarian, the Archdiocese knew, or in the exercise of reasonable care should have known, that McCormack had engaged in inappropriate behavior with minors, had engaged in non-consensual sexual conduct with classmates, and had engaged in non-consensual sexual misconduct with drunk, passed out, and/or sleeping classmates.

104.    In 1994 the Archdiocese hired McCormack and gave him the title of priest.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

105.    From 1994 to 2006, the Archdiocese assigned McCormack to work in various positions, including as a priest at St. Ailbe's Parish, as a teacher and advisor at its college seminary, as a priest at Holy Family Parish, and as a priest at St. Agatha's Parish.

106.    During the time McCormack was an Archdiocesan priest between 1994 and 2006, he was under the control and supervision of the Archdiocese.

107.    During the time McCormack was an Archdiocesan priest between 1994 and 2006, he was an employee, agent, or apparent agent of the Archdiocese.

108.    At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that as a priest McCormack ministered to persons of all ages, including minor children.

109.    At all relevant times the Archdiocese knew, or through the exercise of reasonable care should have known, that as a priest McCormack educated and coached minor children within the Archdiocese.

110.    At all relevant times, Archdiocesan priests worked with, educated, coached, and ministered to minor children within the Archdiocese.

111.    From 1994 to 2006, the Archdiocese knew, or through the exercise of reasonable care should have known, that the positions to which McCormack was assigned provided him with unrestricted and unsupervised contact with minor children.

112.    Between 1994 and 1996, while McCormack was a priest at St. Ailbe's Parish, he had boys in his bedroom, which was a violation of Archdiocese rules and regulations.

113.    Between 1994 and 1996, while McCormack was a priest at St. Ailbe's Parish, he had sexual contact with minor children.

13

FILED DATE: 12/30/2024 7:15 PM 2024L014875

114.    In October 1999, while McCormack was a priest at Holy Family Parish, he inappropriately told a minor boy to pull his pants down so that McCormack could measure him to be an altar boy.

115.    In October 1999, while McCormack was a priest at Holy Family Parish, the Archdiocese, through its Office of Catholic Schools, received repeated reports from a nun that McCormack inappropriately told a minor boy to pull his pants down so that McCormack could measure him to be an altar boy.

116.    At all relevant times, Our Lady of The West Side Catholic School operated two campuses: one at St. Agatha and one at Presentation of the Blessed Virgin Mary (BVM) Parish.

117.    In approximately September 2000, despite having knowledge of McCormack's prior sexual misconduct and inappropriate behavior, the Archdiocese promoted McCormack to the position of Pastor of St. Agatha's Parish.

118.    St. Agatha's Parish included a church, a rectory, and a school campus for Our Lady of The West Side Catholic School.

119.    When Presentation BVM Parish closed in 2005, Our Lady of the West Side Catholic School continued to operate the Presentation campus with support from St. Agatha and the Archdiocese.

120.    From September 2000 through January 2006, McCormack was the Pastor at St. Agatha, a math teacher at Our Lady of the West Side School, and a boys' basketball coach.

121.    As Pastor of St. Agatha's Parish, McCormack's duties included the administration of the parish and parish programs, conducting mass at St. Agatha's Church, administering the Catholic sacraments during church services, providing pastoral care, counseling, spiritual guidance

14

FILED DATE: 12/30/2024 7:15 PM   2024L014875

and leadership to parishioners and students, teaching at the school, coaching youth basketball teams, and overseeing the operation of SAFE.

122.    As Pastor of St. Agatha's Parish, McCormack had unrestricted and unsupervised access to and contact with young boys and adolescent males, both from within St. Agatha's Parish and from outside the Parish, through his roles as priest, counselor, teacher, coach, mentor, father-figure, and friend.

123.    When McCormack was at St. Agatha's Parish, the Archdiocese provided funds and resources to him for the maintenance and operation of St. Agatha's facilities and programs, for the employment of persons in and around the Parish, and for his own personal needs.

124.    On information and belief, while McCormack was at St. Agatha's Parish, he used funds provided to him by the Archdiocese to transport, entertain, and employ young boys and adolescent males.

125.    When McCormack was at St. Agatha's Parish, the Archdiocese paid him a salary and provided him with a residence, food allowance and insurance, and offered him a retirement pension in addition to other benefits.

126.    Between 2000 and 2006, while Pastor of St. Agatha's Parish, McCormack formed, cultivated, and maintained improper and/or sexually abusive relationships with minor boys.

127.    Between 2000 and 2006, while Pastor of St. Agatha's Parish, McCormack had sexual contact with minor boys and male adolescents and maintained sexually abusive relationships with minor boys and male adolescents.

128.    From October 1999 through January 2006, the Archdiocese, through the Office of Catholic Schools, received multiple reports of allegations and/or suspicions regarding McCormack's inappropriate behavior and misconduct with minor students.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

129.    Between 2000 and 2006, while McCormack was Pastor at St. Agatha's Parish, the Archdiocese received multiple reports about McCormack having sexual contact with minor boys and male adolescents.

130.    In September 2003, the Archdiocese, through its Office of Vicars for Priests, received notification that McCormack had taken one or more minor boys on an overnight, out-of-state trip and that he allowed boys in and about St. Agatha's private rectory areas, including his private living quarters.

131.    The Archdiocese failed to investigate the 2003 conduct, to report that conduct to governmental or child protection agencies, to report that conduct to St. Agatha's leaders or parishioners, and/or to restrict McCormack's access to minors.

132.    In August 2005, McCormack was arrested, detained, and questioned by the Chicago Police regarding allegations that he sexually touched one or more minor boys.

133.    In August 2005, the Archdiocese had actual knowledge of McCormack's arrest and detention.

134.    The Archdiocese retained legal representation for McCormack regarding his arrest and investigation.

135.    Despite actual knowledge of McCormack's arrest, the Archdiocese failed to immediately remove McCormack from St. Agatha parish in violation of its Zero Tolerance Policy.

136.    Despite actual knowledge of McCormack's arrest, the Archdiocese failed to report his arrest to St. Agatha's leaders or parishioners, or to effectively restrict McCormack's access to minors at St. Agatha.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

137.    In October 2005, Archdiocese personnel met with the mother or grandmother of the minor boy and they received additional information from her about McCormack's sexual misconduct with her son.

138.    In October 2005, the Archdiocese instructed McCormack to undergo tests and/or evaluations to determine, inter alia, his fitness to be a priest and/or the risk he presented to minor children.

139.    In October 2005, Archdiocese personnel deemed the allegations of sexual abuse against McCormack sufficient to submit the allegations to the Archdiocese Professional Responsibility Review Board ("Review Board").

140.    In October 2005, the Archdiocese's Review Board determined that McCormack should be removed from St. Agatha's Parish for the safety of the children.

141.    Between 2000 and 2005, in addition to the arrest, reports and allegations of improper sexual abuse by McCormack, the Archdiocese received other information, reports, and/or allegations of potential improper or sexual conduct by McCormack.

142.    Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese allowed McCormack to remain at St. Agatha as Pastor.

143.    Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese continued to allow McCormack to have access to minors.

144.    Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from

St. Agatha's Parish, the Archdiocese failed to even place restrictions on McCormack, which would have prevented him from being alone with minors.

145.    Despite multiple reports that McCormack had engaged in sexual misconduct with minors and the Review Board's recommendation that McCormack be removed immediately from St. Agatha's Parish, the Archdiocese failed to prevent the subsequent sexual exploitation of additional minors.

146.    In mid-January 2006, McCormack was again arrested by the Chicago Police for engaging in sexual misconduct with one or more minors.

147.    In January 2006, after McCormack's second arrest, the Archdiocese finally removed McCormack from St. Agatha.

148.    In 2007, at the request of the Archdiocese, the Catholic Church removed (laicized) McCormack from the role of priest.

149.    As of 2021, the Catholic Bishop has received notice of McCormack's improper behavior and/or sexual exploitation of more than 150 minors.

**The Sexual Abuse and Exploitation of John U. Doe by Father McCormack**

150.    The Archdiocese created the false impression in the minds of Plaintiff, his parents and/or adult caregivers, that Plaintiff and other children were safe with priests in general and McCormack in particular.

151.    From approximately 2000-2006, Plaintiff frequently interacted with McCormack including while Plaintiff participated in the in the SAFE program.

152.    From approximately 2000-2006, Plaintiff came into regular contact with McCormack at the St. Agatha's rectory.

FILED DATE: 12/30/2024 7:15 PM    2024L014875

FILED DATE: 12/30/2024 7:15 PM    2024L014875

153. As a result of Plaintiff's interactions with McCormack, Plaintiff came to trust McCormack as a priest, coach, and father figure.

154. Defendants created the false impression in the minds of Plaintiff, his parents or adult caregivers, that Plaintiff and other children were safe with priests in general and McCormack in particular.

155. Between 2000-2002, McCormack groomed the Plaintiff for a sexual relationship by taking him on numerous trips, allowing Plaintiff to hang-out at the St. Agatha's Rectory and assist with basketball practice for the older boys.

156. In approximately 2003, McCormack began an abusive sexual relationship with Plaintiff while he was a minor.

157. Between approximately 2003 and 2006, McCormack engaged in sexually abusive conduct toward Plaintiff that included physically hugging Plaintiff, patting and rubbing Plaintiff's body, visually inspecting Plaintiff's penis, fondling and orally stimulating Plaintiff's penis and anal penetration.

158. At all relevant times, McCormack's actions toward Plaintiff constituted sexual abuse.

159. McCormack's sexual abuse of Plaintiff severely injured Plaintiff physically, psychologically, spiritually, and emotionally.

160. In addition to McCormack's sexual abuse of Plaintiff, McCormack sexually abused other children and adolescents during McCormack's years as a priest of the Archdiocese of Chicago, including during his tenure at St. Agatha's Parish.

FILED DATE: 12/30/2024 7:15 PM   2024L014875

161. In July 2007, McCormack pled guilty to having had sexually abused multiple boys and to having had sexually abusive relationships with multiple boys during the time he worked for the Archdiocese of Chicago as a priest.

162. After his felony convictions for sexually abusing minors, a court determined that McCormack was a sexually violent person and ordered that McCormack be committed to a State of Illinois facility for sex offenders.

163. Until recently, McCormack was confined as a sexually violent person.

## COUNT I – NEGLIGENCE

164. Plaintiff repeats and re-alleges the paragraphs of the General Allegations as the first paragraph of this Count.

165. At all relevant times, the Archdiocese had a duty to exercise reasonable care in its operation, management, and control of its parishes, schools, and programs, including St. Agatha's Parish, Our Lady of the West Side School, and SAFE.

166. At all relevant times, the Archdiocese had a duty to exercise reasonable care in its employment, appointment, supervision, retention, empowerment, and endorsement of its priests, including McCormack.

167. At all relevant times, the Archdiocese had a duty to exercise reasonable care to protect minor children who it knew or should have known would come into contact with McCormack.

168. In breach of the aforesaid duties, the Archdiocese was guilty of one or more of the following negligent acts and/or omissions:

    a. Held McCormack out to everyone as a fit and competent agent of the Archdiocese and a minister of Christ;

    b. Hired McCormack as an employee despite knowledge of his sexually abusive and deviant behavior;

20

FILED DATE: 12/30/2024 7:15 PM    2024L014875

c.   Retained McCormack as a priest and employee despite knowledge of his sexually abusive and deviant behavior;

d.   Failed to transfer or communicate McCormack's history of sexual misconduct within the seminary, orally or through his file, to his subsequent parishes or assignments;

e.   Allowed McCormack to interact with minors after being advised of allegations of sexual misconduct or abuse;

f.   Failed to properly investigate reports of inappropriate sexual behavior, inappropriate conduct and/or sexual abuse by priests, including McCormack;

g.   Failed to have an adequate system in place to monitor and/or remove dangerous priests, including McCormack;

h.   Disregarded the recommendation of the Cardinal's Commission that priests who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would give them access to a minor;

i.   Misrepresented to the public the manner in which it addressed sexual abuse by priests, including that it had a "zero tolerance policy" for sexual abuse of minors;

j.   Failed to supervise and/or properly supervise McCormack;

k.   Failed to monitor and/or properly monitor McCormack;

l.   Failed to protect minor boys, including Plaintiff, from McCormack's sexual abuse;

m.   Allowed McCormack to have unrestricted and/or unsupervised access to boys and adolescents;

n.   Failed to warn the St. Agatha and Our Lady of the West Side School communities, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

o.   Failed to warn the public, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

p.   Failed to implement and/or enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

q.   Failed to properly implement and/or properly enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

r.   Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions of priest sexual misconduct with minor students;

s.   Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions related to McCormack's sexual misconduct with minor students;

FILED DATE: 12/30/2024 7:15 PM    2024L014875

t.    Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding their reporting responsibilities under the Abused and Neglected Child Reporting Act, 325 ILCS 5/1, *et seq.*;

u.    Failed to report McCormack to law enforcement or other civil authorities when it knew or should have known of his sexual misconduct and/or abuse against children and adolescents; and

v.    Failed to remove McCormack immediately after his first arrest in August of 2005.

169.    As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions committed by the Archdiocese, Plaintiff suffered severe and ongoing injuries of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1.  Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars ($50,000) for compensatory damages;
2.  Awarding reasonable costs to Plaintiff; and
3.  Providing such other relief as the Court deems just and equitable.

## COUNT II – WILLFUL & WANTON

170.    Plaintiff repeats and re-alleges the paragraphs of the General Allegations as the first paragraph of this Count.

171.    At all relevant times, the Archdiocese had a duty to exercise reasonable care in its operation, management, and control of its parishes, schools, and programs, including St. Agatha's Parish, Our Lady of the West Side School, and SAFE.

172.    At all relevant times, the Archdiocese had a duty to exercise reasonable care in its employment, appointment, supervision, retention, empowerment, and endorsement of its priests, including McCormack.

173.    At all relevant times, the Archdiocese had a duty to exercise reasonable care to protect minor children who it knew or should have known would come into contact with McCormack.

FILED DATE: 12/30/2024 7:15 PM   2024L014875

174.    At all relevant times, the Archdiocese was guilty of conduct showing an utter indifference to or conscious disregard for the safety of others, including minors and the Plaintiff.

175.    At all relevant times, the Archdiocese was guilty of one or more of the following willful and wanton acts and/or omissions:

a.    Held McCormack out to everyone as a fit and competent agent of the Archdiocese and a minister of Christ;

b.    Hired McCormack as an employee despite knowledge of his sexually abusive and deviant behavior;

c.    Retained McCormack as a priest and employee despite knowledge of his sexually abusive and deviant behavior;

d.    Failed to transfer or communicate McCormack's history of sexual misconduct within the seminary, orally or through his file, to his subsequent parishes or assignment;

e.    Allowed McCormack to interact with minors after being advised of allegations of sexual misconduct or abuse;

f.    Failed to properly investigate reports of inappropriate sexual behavior, inappropriate conduct and/or sexual abuse by priests, including McCormack;

g.    Failed to have an adequate system in place to monitor and/or remove dangerous priests, including McCormack;

h.    Disregarded the recommendation of the Cardinal's Commission that priests who engaged in sexual misconduct with a minor should not be returned to parish ministry or any ministry which would give them access to a minor;

i.    Misrepresented to the public the manner in which it addressed sexual abuse by priests, including that it had a "zero tolerance policy" for sexual abuse of minors;

j.    Failed to supervise and/or properly supervise McCormack;

k.    Failed to monitor and/or properly monitor McCormack;

l.    Failed to protect minor boys, including Plaintiff, from McCormack's sexual abuse;

m.    Allowed McCormack to have unrestricted and/or unsupervised access to boys and adolescents;

n.    Failed to warn the St. Agatha and Our Lady of the West Side School communities, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

FILED DATE: 12/30/2024 7:15 PM    2024L014875

o.     Failed to warn the public, including Plaintiff, of any of the allegations of sexual abuse directed at McCormack, therefore denying them the ability to protect themselves from his pedophiliac tendencies;

p.     Failed to implement and/or enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

q.     Failed to properly implement and/or properly enforce policies and procedures relating to the prevention, detection or reporting of sexual abuse of minors;

r.     Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions of priest sexual misconduct with minor students;

s.     Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding policies and/or procedures for reporting allegations or suspicions related to McCormack's sexual misconduct with minor students;

t.     Failed to train Archdiocesan personnel, including Office of Catholic Schools personnel, regarding their reporting responsibilities under the Abused and Neglected Child Reporting Act, 325 ILCS 5/1, *et seq.*;

u.     Failed to report McCormack to law enforcement or other civil authorities when it knew or should have known of his sexual misconduct and/or abuse against children and adolescents; and

v.     Failed to remove McCormack immediately after his first arrest in August of 2005.

176.     As a direct and proximate result of one or more of the aforesaid willful and wanton acts and/or omissions committed by the Archdiocese, Plaintiff suffered severe and ongoing injuries of a personal and pecuniary nature.

WHEREFORE, Plaintiff respectfully requests the following relief:

1. Granting judgment in favor of the Plaintiff in excess of Fifty Thousand Dollars ($50,000) for compensatory damages;
2. Awarding punitive damages to Plaintiff as allowable under Illinois law;
3. Awarding reasonable costs to Plaintiff; and
4. Providing such other relief as the Court deems just and equitable.

Respectfully submitted,

*/s/ Gregory T. Condon*
Attorney for Plaintiff John U. Doe

FILED DATE: 12/30/2024 7:15 PM    2024L014875

Gregory T. Condon
Condon Law Firm (#65866)
322 W. Burlington Ave.
La Grange, IL 60525-2363
(708) 579-3888
gcondon@condonlawyers.com

Michael A. Faccenda
Faccenda Law Group LLC (#61089)
322 W. Burlington Ave.
La Grange, IL 60525-2363
(708) 497-3077
maf@faccendalawgroup.com

James E. Coogan
Caroleann Gallagher
Coogan Gallagher (#100030)
444 N. Northwest Hwy., Suite 300
Park Ridge, Illinois 60068
(312) 782-7482
jcoogan@cgtrial.com
cgallagher@cgtrial.com

FILED DATE: 12/30/2024 7:15 PM   2024L014875

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | |
|---|---|
| JOHN U. DOE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. _____ |
| v. | ) |
| | ) |
| THE CATHOLIC BISHOP OF CHICAGO, a | ) |
| Corporation Sole, and THE ARCHDIOCESE | ) |
| OF CHICAGO, | ) |
| | ) |
| Defendants. | ) |

## RULE 222 AFFIDAVIT

The undersigned certifies that the total amount of money damages sought in this

Complaint at Law, exclusive of interest, costs and attorney's fees, exceeds the amount of

$50,000.00.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure,
the undersigned certifies that the statements set forth in this instrument are true and correct,
except as to matters therein stated to be on information and belief and as to such matters the
undersigned certifies as aforesaid that he verily believes the same to be true.

*/s/ Gregory T. Condon*
_____

Attorney for Plaintiff John U. Doe

26